UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LILLIAN CARTER, RUSSELL CARTER,
CHAD CARTER, TERRANCE WILSON,
and VIRGIL WILLIAMS,

                              Plaintiffs,

        -against-

UNITED STATES OF AMERICA,

                              Defendant.
-----------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★  JUL 2 2 2010  ★
BROOKLYN OFFICE

ORIGINAL
Ɗ Ɛ F
C I M

**MEMORANDUM AND ORDER**
Case No. 04-CV-4880 (FB) (JMA)

*Appearances*
*For Plaintiffs:*
BRETT KLEIN, ESQ.
Leventhal & Klein, LLP
45 Main Street, Suite 820
Brooklyn , NY 11201

*For Defendant:*
LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
By: Scott R. Landau, Esq.
271 Cadman Plaza East
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

        In the early morning hours of February 25, 2004, armed law enforcement

officers invaded plaintiffs' home based on what turned out to be incorrect information that

a suspect named Kinte Carter lived there. Plaintiffs thereupon sued the individual officers

under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),

and the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§§ 1346, 2671-80.

        The *Bivens* claim was tried to a jury, which found the individual defendants

not liable. The FTCA claim was then tried to the Court. For the reasons explained in the

following findings of fact and conclusions of law, the Court awards plaintiff Lillian Carter ("Lillian") $300,000 for past and future emotional distress suffered because an employee of the United States Postal Service negligently misinformed law enforcement that Kinte Carter resided in Lillian's home.[1]

## FINDINGS OF FACT[2]

### A. Background

In 2004, Lillian lived with her husband Russell ("Russell"), her sons Chad Carter and Terrance Wilson ("Chad" and "Terrance," respectively), and her younger cousin Virgil Williams ("Virgil") at 525 Cary Avenue, in the Port Richmond neighborhood of Staten Island. Between late 2002 and early 2004, Special Agent Jon Ellwanger ("Ellwanger") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") was investigating narcotics activity and violent crime in the neighborhood.

By February 2004, Ellwanger's investigation had yielded indictments and arrest warrants for twenty-eight suspected members of two rival drug gangs in the area. One of those suspects was Kinte Carter, who was considered by law enforcement to be armed and dangerous.

### B. The Investigation into Kinte Carter's Address

On separate occasions, two confidential informants pointed out to Ellwanger

---

[1] Since the remaining plaintiffs did not adduce any evidence of their damage, the Court treats Lillian as the sole plaintiff.

[2] In addition to the evidence adduced at the bench trial, the Court has considered, insofar as it is pertinent, the evidence adduced at the jury trial.

three or four houses in the 500 block of Cary Avenue and stated that Kinte Carter may have lived in one of them. Ellwanger eventually identified 526 and 471 Cary Avenue as possible addresses for Kinte Carter. He also identified 35 Holland Avenue, Apt. 5E, as a third possible address.

On February 17, 2004, a member of Ellwanger's team, Special Agent Tom Shelton ("Shelton") faxed a request to the Postal Inspection Service to verify the three possible addresses for Kinte Carter (along with possible addresses for several other suspects). The Postal Inspection Service is the law-enforcement arm of the United States Postal Service; one of its primary functions is to verify addresses at the request of law-enforcement agencies.

Shelton's request was processed by several Inspection Service Operation Technicians, including Wilhelmina Corley ("Corley"). Corley has worked at the Postal Inspection Service for over ten years. Although her training was brief and informal, she understood that requesting agencies expected her to provide reliable information to be used to "track people down." Trial Tr. at 1025.

Corley was responsible for verifying the possible addresses for Kinte Carter. In that regard, she contacted the postal carrier responsible for the 500 block of Cary Avenue. Neither Corley nor the carrier remembered any conversation regarding Kinte Carter. Based, however, on the carrier's testimony that he did not recall Kinte Carter ever receiving mail at 525 Cary Avenue, the Court finds that he told Corley only that a Carter *family* received mail at 525 Cary Avenue.

Following her usual procedure, Corley made handwritten notes of her investigation on the fax from Shelton. Her note-taking method invited confusion regarding names: As she learned who received mail at each address, she would sometimes write a first and last name, sometimes just a last name, and sometimes a last name with the notation "FNU" ("first name unknown"). Next to the entry for 526 Cary Avenue, she wrote "Vasquez fam.," Pls.' Ex. 30. Above it, she wrote "525 Carter (good)." *Id.*

Corley later typed out her notes on another copy of Shelton's fax; she had no recollection of how much time passed before she transcribed her handwritten notes. Since she received Shelton's fax on February 17th and sent her response on February 20th, there could have been as much as a three-day delay. During that time, Corley was responding to "numerous, if not hundreds of" other address verification requests. Trial Tr. at 1041-42.

For 526 Cary Avenue, Corley's handwritten notes became "KINTE CARTER IS GOOD AT 525 CARY AVE. 526 CARY AVENUE – VASQUEZ FAMILY IS GOOD." Pls.' Ex. 29. In other words, Corley incorrectly assumed that the reference to "Carter" in her handwritten notes referred to Kinte Carter. By comparison, Corley transcribed her handwritten note "Viola (FNU)" as "VIOLA FAMILY," and her handwritten note "Edmond" as "EDMOND FAMILY." Pls.' Exs. 28-30. Kinte Carter was the only subject whose first name did not appear in Corley's handwritten notes but was included in her response to ATF. In sum, the Court finds that Corley failed to use due care in transcribing her handwritten notes and, as a result, erroneously reported to ATF that Lillian's home was a "good" address for Kinte Carter.

Corley's fax caused Ellwanger to change his focus from 526 to 525 Cary Avenue. At Ellwanger's request, one of the confidential informants returned to the 500 block and reported back that 525 Cary Avenue was one of the houses where Kinte Carter might have lived. Ellwanger then confirmed with Consolidated Edison ("ConEd") that someone with the last name "Carter" received utility service at 525 Cary Avenue; however, the name "Kinte" did not appear in ConEd's records. Finally, Ellwanger asked a New York City Police Department detective in the 120th Precinct if Kinte Carter was "associated" with 525 Cary Avenue; the detective (whose name Ellwanger could not remember) said he was. Trial Tr. at 510. Ellwanger would not have approved a search of 525 Cary Avenue had Corley not reported it as a "good" address for Kinte Carter.

## C. Execution of the Search Warrant

The arrest warrants for Kinte Carter and 27 others were executed simultaneously in the early morning of February 25, 2004, by hundreds of agents from multiple law enforcement agencies. The executing officers had not participated in the investigation.

The four officers executing the arrest warrant for Kinte Carter went to 525 Cary Avenue. They knocked loudly on the door and Lillian let them in. At that time, she was the only occupant who was awake: Russell was not at home, while Chad, Terrance and Virgil were asleep in their bedrooms.

The officers told Lillian that they were looking for Kinte Carter and proceeded to search each room in the house, with their guns drawn for at least part of the

search. Lillian accompanied some of the officers, going with them to the bedrooms and the basement. She honestly -- although incorrectly -- believed that one of the officers held a gun to her back throughout the search because she felt something cold touch her neck and back, though she never saw what it was.

The search took approximately 30 minutes. Kinte Carter was not found. The Court credits Lillian's testimony that Kinte Carter was unknown to her and her family and had never been in their home.

### D. Lillian's Injuries

Lillian was terrified that she or one of her family members might be killed during the search. Moreover, she began to think that the suspect the officers were seeking might have broken into her home, and that she would be killed in a firefight between him and the officers. Following the search, Lillian had nightmares about alternate versions of the incident in which members of her family were killed, and flashback hallucinations in which she felt a gun on her neck.

In addition, the incident dramatically affected Lillian's ability to enjoy her work or the company of her family. Her relationships with her sons and the younger cousin for whom she was caring deteriorated. Her fear of having her house invaded motivated her to install security cameras on the exterior of her home and watch the attached video monitor constantly. She eventually moved upstate -- temporarily abandoning her family -- because of the fear she associated with her house on Cary Avenue.

Two days after the incident, Lillian saw her primary-care physician, Dr. Salvator Prainito. He prescribed Xanax, a tranquilizer that Lillian had previously taken to reduce anxiety. As of the time of trial, Lillian was still taking Xanax.

Dr. Prainito referred Lillian to Dr. Santapuri Rao, a psychiatrist. Dr. Rao treated Lillian between June of 2004 and June of 2005. He diagnosed her as suffering from Post-Traumatic Stress Disorder ("PTSD") and, in addition to continuing Lillian on Xanax, prescribed Paxil, another anti-anxiety medication that Lillian had been taking prior to the incident; he eventually quadrupled Lillian's dosage of Paxil from her pre-incident prescription.

When Lillian moved upstate, she began treatment at an outpatient mental-health clinic in Monticello, New York. Psychiatrists there confirmed the diagnosis of PTSD and, over time, moved Lillian from Paxil to a combination of medications to manage her continuing anxiety. As of the time of trial, Lillian was still receiving treatment and continuing her medication regimen.

At trial, the medical experts proffered by both Lillian and the United States agreed that Lillian suffered from PTSD as a result of the incident; however, they disagreed as to her prognosis and the amount of anxiety attributable to other causes. Having reviewed the evidence in its entirety, the Court finds that Lillian's PTSD, although less pronounced than it was immediately after the incident, is chronic. In addition, the Court finds that other stressors (such as financial and health problems both before and after the incident) have contributed to Lillian's anxiety, but that the incident was, and continues to

7

be, a principal cause of her PTSD and its negative effect on her quality of life.[3]

## CONCLUSIONS OF LAW

### A. Jurisdictional Matters

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Because sovereign immunity is jurisdictional in nature, the "terms of [the United States's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (quoting, with alteration, *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

The waiver at issue here is embodied in the FTCA, which grants the district courts:

> exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). That jurisdictional grant is subject to the remaining provisions of the the FTCA, 28 U.S.C. §§ 2671-2680.

In its post-trial memorandum of law, the United States argues that the Court lacks subject-matter jurisdiction over Lillian's FTCA claim for two reasons. First, it argues that she cannot satisfy the "private analog requirement" of § 2674, which provides that the

---

[3]Lillian is currently unable to work due to back problems. She does not claim that her inability to work is attributable to the incident.

United States is liable only "in the same manner and to the same extent as a private individual under like circumstances." Second, it argues that her claim falls within the "discretionary function exception" of § 2680(a), which preserves sovereign immunity from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." In addition, the Court *sua sponte* raised the issue of whether the "misrepresentation" exception of § 2680(h) bars Lillian's claim.[4]

For the following reasons, the Court concludes that Lillian's claim against the United States has a private analog, and that it does not fall within either the discretionary-function exception or the misrepresentation exception.

## 1. The Private Analog Requirement

The private analog requirement "limit[s] the bases for the United States' liability to those 'circumstances that would bring private liability into existence.'" *C.P. Chem. Co. v. United States*, 810 F.2d 34, 37 (2d Cir. 1987) (quoting *Feres v. United States*, 340 U.S. 135, 141 (1950)). Thus, the question of whether a private analog exists is, at bottom, a question of "whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred." *Rayonier, Inc. v. United States*, 352 U.S. 315,

---

[4]Although normally raised in a pre-trial motion, the issue of subject-matter jurisdiction may be raised at any time, *see* Fed. R. Civ. P. 12(h)(3); even if not raised by a party, federal courts have an independent obligation to satisfy themselves that subject-matter jurisdiction is present. *See Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006).

319 (1957). The United States argues that there can be no private analog in this case because the Post Office's address-verification service is a "purely governmental function" in which private persons could not engage. Def.'s Mem. of Law at 20.

The Supreme Court has rejected the argument that "uniquely governmental functions" are, *ipso facto*, exempt from liability. *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955). Thus, the private analog requirement "do[es] not restrict a court's inquiry to the same circumstances, but require[s] it to look further afield." *United States v. Olson*, 546 U.S. 43, 47 (2005) (citing *Indian Towing Co.*, 350 U.S. at 64). In *Olson*, the high court found a valid analogy -- and, therefore, potential FTCA liability -- between federal mine inspectors and "private persons who conduct safety inspections." *Id.* (internal quotation marks omitted). In *Indian Towing*, it concluded that the Coast Guard's negligent operation of a lighthouse had a private analog: "[I]t is hornbook law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." 350 U.S. at 64-65. It is nevertheless true that, "as to certain governmental functions, the United States cannot be held liable, for no private analog exists." *C.P. Chem. Co.*, 810 F.2d at 37. Such functions have been held to include banning unsafe products, *see id.*; revoking citizenship, *see Akutowicz v. United States*, 859 F.2d 1122 (2d Cir. 1988); and regulating exports, *see Dorking Genetics v. United States*, 76 F.3d 1261 (2d Cir. 1996).

As the relevant analog for Corley's conduct, Lillian invokes a "variant" of the Good Samaritan liability recognized in *Indian Towing*; as explained in the Restatement:

10

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). This variant of liability is recognized in New York. *See Dorking Genetics*, 76 F.3d at 1267 (citing *Miller v. Rivard*, 585 N.Y.S.2d 523, 527 (3d Dep't 1992)).[5]

Many government activities could be described as voluntary undertakings, however, and the case law sheds little light on when Good Samaritan liability provides a private analog (as in *Indian Towing*) and when it does not (as in *C.P. Chemical*, *Akutowicz* and *Dorking Genetics*). The Court need not grapple with that issue here because another

---

[5]As its name suggests, "Good Samaritan" liability was initially imposed on volunteers coming to plaintiffs' aid. In its modern form, however, the doctrine applies whether the defendant is acting "gratuitously or for consideration." Restatement (Second) of Torts § 324A (1965). Thus, the Supreme Court could describe federal lighthouse operators as "good Samaritan[s]" even though they were acting as paid employees. *See Indian Towing*, 350 U.S. at 64; *see also Glanzer v. Shepard*, 233 N.Y. 236, 239 (1922) ("The surgeon who unskillfully sets the wounded arm of a child is liable for his negligence, though the father pays the bill."). The form of liability might more accurately be described as arising out of "the tortfeasor's voluntary undertaking." *Dorking Genetics*, 76 F.3d at 1267.

form of private liability precisely covers this case:

> (1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
>
> > (a) to the other, or
> >
> > (b) to such third persons as the actor should expect to be put in peril by the action taken.
>
> (2) Such negligence may consist of failure to exercise reasonable care
>
> > (a) in ascertaining the accuracy of the information, or
> >
> > (b) in the manner in which it is communicated.

Restatement (Second) of Torts § 311 (1965).

As explained in the Commentary to this section, the duty to use due care in conveying correct information extends to anyone who "undertakes to give information to another, and knows or should realize that the safety of the person of [*sic*] others may depend upon the accuracy of the information." *Id.* cmt. b. As with Good Samaritan liability, it does not matter whether the information is given gratuitously or in the course of the actor's business or profession. *Id.* cmts. b, c.

Although the New York Court of Appeals has not expressly adopted section 311, it has cited the section and its commentary with approval. *See Heard v. City of New York*, 82 N.Y.2d 66, 75 (1993). In addition, it has long recognized that "words as well as acts may serve as the premise for a negligence action." *Id.* at 73. The Court is confident,

therefore, that Lillian's claim is "comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred." *Dorking Genetics*, 76 F.3d at 1266 (internal citation omitted).

## 2. *Discretionary Function Exception ("DFE")*

Under the *Berkovitz-Gaubert* test, "the DFE bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing *United States v. Gaubert*, 499 U.S. 315 (1991), and *Berkovitz v. United States*, 486 U.S. 531 (1988)).

In a broad sense, the Post Office's address-verification service involves elements of judgment or choice grounded in considerations of public policy. Whether to offer the service at all certainly implicates such considerations. *Cf., e.g., Kelly v. United States*, 924 F.2d 355, 362 (1st Cir. 1991) ("Since decisions to investigate, or not, are at the core of law enforcement activity, the bureau chiefs' challenged conduct involved precisely the kind of policy-rooted decisionmaking that section 2680(a) was designed to safeguard."). In addition, the choice of methods and procedures -- how many employees to assign to the task, how to obtain the requested information, whether to require "double-checking" -- would fall within the exception. *Cf., e.g., Pooler v. United States*, 787 F.2d 868, 869 (3d Cir. 1986) (holding that choice of investigatory methods, such as whether to use an informant,

13

fell within the DFE).

By contrast, Corley's role in the process -- in particular, her mistake in transcribing her notes -- did not involve the type or degree of discretion contemplated by the DFE. To be sure, she had some minimal degree of discretion in how to record and transmit the information she received, but such choices were not policy-based. To hold otherwise would foreclose virtually all liability under the FTCA "because almost every act involves some modicum of discretion regarding the manner in which one carries it out." *Coulthurst*, 214 F.3d at 110. Rather, Corley's error was the result of simple carelessness, for which the DFE does not foreclose liability. *See id.* ("[I]f the inspector failed to perform a diligent inspection out of laziness or was carelessly inattentive, the DFE does not shield the United States from liability.").[6]

### 3. *Misrepresentation Exception*

Section 2680(h) preserves sovereign immunity for "[a]ny claim arising out of . . . misrepresentation." In *United States v. Neustadt*, 366 U.S. 696 (1961), the Supreme Court held that the exception "comprehends claims arising out of negligent, as well as willful, misrepresentation." *Id.* at 702. Moreover, the exception "bars not only claims of negligence in the misrepresentation, but in the conduct underlying the misrepresentation." *Dorking*

---

[6]In her complaint, Lillian alleged that the United States was liable for negligent hiring, training and supervision of its postal inspectors. *See* 2d Am. Compl. ¶59. She has not pursued that theory, focusing instead on Corley's mistake in transcribing her notes, but if she had, the Court would hold that the hiring, training and supervision of postal inspectors falls within the DFE. *See, e.g., Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("[F]ederal courts have found that such hiring, training and supervision decisions generally fall within the exception." (citing cases)).

*Genetics*, 76 F.3d at 1264. The exception does not, however "bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." *Block v. Neal*, 460 U.S. 289, 296 (1983). Thus, "[r]ecovery is not barred . . . if the plaintiff alleges the breach of a cognizable duty owed to him which is 'distinct from any duty to use due care in communicating information.'" *Dorking Genetics*, 76 F.3d at 1265 (quoting *Block*, 460 U.S. at 297).

Lillian argues that the focal point of her claim is "Corley's negligent performance of an operational task which is distinct from the failure to use due care in communicating information." Pls.' Letter Mem. (Dec. 18, 2009) 2. More specifically, she points to Corley's "negligent investigation of whether Kinte Carter received mail at 526 Cary Avenue" and the "negligent preparation of her report" stating that he did. *Id.*

Corley's negligence in transcribing her notes did not itself involve any misrepresentation, but it did constitute "the conduct underlying the misrepresentation." *Dorking Genetics*, 76 F.3d at 1264. The only reason Corley was investigating Kinte Carter's possible addresses was to communicate the results of her investigation to the ATF; her negligence in transcribing her notes caused her to negligently misrepresent that "KINTE CARTER IS GOOD AT 525 CARY AVE." Pls.' Ex. 29. To that extent, Lillian's claim falls within the misrepresentation exception.

In the alternative, however, Lillian argues that even if her claim focuses on a duty to use due care in conveying information, Congress did not intend to preclude tort liability for misrepresentations not involving the two elements -- harm to a financial or

15

commercial interest, and reliance by the plaintiff -- traditionally associated with the common-law concept of misrepresentation as an independent tort. The Court agrees, at least with respect to the reliance element.

"[M]any familiar forms of negligent conduct may be said to involve 'misrepresentation' in the generic sense of the word." *Neustadt*, 366 U.S. at 711 n.26. However, as plaintiff points out, the Supreme Court in *Block* explained that a misrepresentation claim, as traditionally understood, has "been identified with the common law action for deceit, and has been confined very largely to the invasions of interests of a financial or commercial character, in the course of business dealings." 460 U.S. at 296 n.5 (citations and internal quotation marks omitted). This observation tracks a comparable footnote in *Neustadt*. *See* 366 U.S. at 711 n.26. The Court in *Block* further observed that "the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." 460 U.S. at 296.

Notwithstanding the footnotes, *Neustadt* and *Block* dealt with the misrepresentation except only in the context of representations relied upon by the plaintiffs to their financial detriment. Since the claim in the present case involves neither financial harm nor reliance by the plaintiff, the question becomes whether Congress intended the misrepresentation exception to cover *only* those claims containing both elements.

"[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify 'those circumstances which are within the

16

words and reason of the exception' -- no less and no more." *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984) (quoting *Dalehite v. United States*, 346 U.S. 15, 31 (1953)). In that regard, the exceptions to the FTCA are not subject to the usual rule that waivers of sovereign immunity are to be strictly construed. *See id.* ("We find such an approach unhelpful [because] unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute."). Moreover, the legislative history of the FTCA is silent on the intended scope of the misrepresentation exception.

Nor can the Court look to the Second Circuit for guidance. In *Kohn v. United States*, 680 F.2d 922 (2d Cir. 1982), the circuit court acknowledged, in *dicta*, that the exception had "generally been applied only to actions for damages due to commercial decisions," *id.* at 926; however, it later stated (again in *dicta*) that "*Kohn* stopped well short of holding that the United States had waived sovereign immunity for non-commercial torts arising from its suppression of information or its release of information that was fraudulent." *Cabiri v. Government of Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999). Thus, neither the Supreme Court nor the Second Circuit has definitively answered the question presented.

Other circuit courts have reached discordant answers. In *Lawrence v. United States*, 340 F.3d 952 (9th Cir. 2003), the plaintiff was sexually abused by an employee of a state agency; she argued that a federal marshal and probation officer had negligently misrepresented the assailant's character to the hiring agency. The Ninth Circuit concluded, without explanation, that the misrepresentation exception barred the claim. *See id.* at 958.

17

By contrast, the First Circuit discussed the issue at length in *Jimenez-Nieves v. United States*, 682 F.2d 1 (1st Cir. 1982). Writing for the court, then-Judge Breyer read *Neustadt* as pegging the scope of the misrepresentation to "the 'traditional and commonly understood definition of the tort.'" *Id.* 3-4 (quoting *Neustadt*, 366 U.S. at 706). To ascertain that understanding, he turned to the Restatement:

> While the Restatement indicates that the tort of misrepresentation involves the dissemination of information generally and not only in commercial contexts, it makes clear that *one essential element of misrepresentation remains reliance by the plaintiff himself upon the false information that has been provided.*

*Id.* at 4 (emphasis added). Thus, Judge Breyer drew a distinction between commercial loss and reliance by the plaintiff, with only the latter being an "essential element" of the tort of misrepresentation. He further argued that to expand the exception to cases not involving reliance by the plaintiff would lead to "bizarre" results:

> If the fact that a tortious act is caused by a false statement were sufficient to bring it within the Federal Tort Claims Act's misrepresentation exception, the results would be bizarre. An injured pedestrian could not recover if, for example, the government truck driver ran over him because his co-worker falsely told him that the light was green. Nor could a homeowner recover should a government demolition crew wreck his house after being sent to the wrong address. Such cases are not, however, typically considered as examples of the separate tort category of "misrepresentation."

*Id.* at 4.

Without citing *Jiminez-Nieves*, the Fifth Circuit independently reached Judge Breyer's conclusion in *Saraw Partnership v. United States*, 67 F.3d 567 (5th Cir. 1995): "Where

there is no detrimental reliance [by the plaintiff] on an alleged miscommunication, no claim for misrepresentation is made." *Id.* at 571. The Ninth Circuit did not cite either *Jimenez-Nieves* or *Saraw Partnership* in *Lawrence*. More recently, the Tenth Circuit cited *Jimenez-Nieves* in *Estate of Trentadue v. United States*, 397 F.3d 840 (10th Cir. 2005); but whereas Judge Breyer concluded only that reliance by the plaintiff was an essential element of misrepresentation, the Tenth Circuit concluded that *both* reliance and financial harm were necessary to the tort. *See id.* at 854 ("Two essential components of negligent misrepresentation -- reliance and pecuniary loss -- are not present on the record before us.").[7]

As previously explained, the private analog here is embodied in section 311 of the Restatement, which embraces within the definition of "misrepresentation" statements relied on by a third party that subsequently cause injury to the plaintiff -- statements which Judge Breyer and the concurring circuits have nonetheless held do not come within the FTCA's misrepresentation exception. The commentary to section 311 notes that this form of liability "represents a somewhat broader liability" than the Restatement section cited by *Jimenez-Nieves* for the "traditional" definition of the tort. *Id.* cmt. a.

---

[7]The Tenth Circuit's use of the phrase "pecuniary loss" is apt to cause confusion, since victims of personal injury often suffer such loss (in the form of medical bills or lost wages). To reiterate, the relevant distinction is not between pecuniary and non-pecuniary loss, but between "invasions of interests of a financial or commercial character," *Block*, 460 U.S. at 296 n.5, and harm to one's person or property.

That New York tort law may impose liability for negligent misrepresentations even in the absence of reliance by the plaintiff does not necessarily mean that Congress intended to classify such liability as "misrepresentation." Although the First, Fifth and Tenth Circuits did not address section 311 in their analyses, Judge Breyer did note that the Restatement recognizes that "misrepresentation runs all through the law of torts as a method of accomplishing various (other) tortious conduct," which methods are "usually grouped under categories of their own." *Jimenez-Nieves*, 682 F.2d at 4 (quoting Restatement (Second) of Torts ch. 22). In other words, the tort described in section 311 can most accurately be described as a variant of negligence, rather than the separate tort traditionally denominated "misrepresentation."

Although the issue is debatable, the Court believes that it is on firm footing in adopting Judge Breyer's conclusion and reasoning in *Jiminez-Nieves*, as well as those of the Fifth and Tenth Circuits, at least to the extent that they collectively conclude that reliance by the plaintiff is an essential element of the traditional tort of misrepresentation. In further support of that conclusion, the Court notes that the misrepresentation exception appears in a list of well-defined, independent bases of tort liability -- "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contract rights," 28 U.S.C. § 2680(h); the "commonsense canon of *noscitur a sociis* . . . counsels that a word is given a more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 295 (2008).

In sum, the Court concludes that Corley's incorrect statement to the ATF, though implicating a duty of care in the communication of information, does not fall within the FTCA's misrepresentation exception.

## B. The Merits

Since the plaintiff's claim is a variant of negligence liability, she must satisfy the conventional elements of negligence, namely "the existence of a duty, a breach of that duty, and that such breach was a proximate cause of the events which produced the injury." *Lapidus v. State*, 866 N.Y.S.2d 711, 719 (2d Dep't 2008). In addition, in order to be compensated, a plaintiff must show damages. *See Hyatt v. Metro-North Commuter R.R.*, 792 N.Y.S.2d 391, 392 (1st Dep't 2005).

### 1. Duty and Breach

Because Corley was aware of the use to which her information would be put, it was foreseeable that providing incorrect information would lead to a search of an innocent person's home, and that that person might suffer physical or emotional injuries as a result. *See* Restatement (Second) of Torts § 311(1)(b) (extending liability to "such third persons as the actor should expect to be put in peril by the action taken"); *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 344 (1928) ("The risk reasonably to be perceived defines the duty to be obeyed[.]").

### 2. Causation

Corley's negligence was the proximate cause of the mistaken search of the home. "The proximate cause of an event must be held to be that which in a natural

sequence, unbroken by any new cause, produces that event and without which that event would not have occurred." *Rider v. Syracuse Rapid Transit Ry. Co.*, 171 N.Y. 139, 147 (1902). Before Corley's fax, Ellwanger had information connecting Kinte Carter to a handful of houses that his informants had pointed out on the 500 block of Cary Avenue, with number 526 being the most promising. By contrast, number 525 did not even appear on Ellwanger's operational plan or the list of addresses he asked the Postal Inspection Service to verify. Thus, as the Court has found, Corley's mistake caused Ellwanger to focus on 525 Cary Avenue instead of 526.

Ellwanger's subsequent acts did not break the chain of causation because they were themselves motivated by Corley's negligence. In any event, his call to ConEd confirmed only that someone with the last name "Carter" lived at number 525, while his conversation with a detective at the 120th Precinct took place only after Ellwanger had decided to include 525 Cary Avenue in the list of locations to be searched.

### 3. *Damages*

Lillian seeks damages for the pain and suffering resulting from her emotional distress. "The measure of damages for pain and suffering and emotional distress is fair and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case. Unlike pecuniary losses, these damages are, by their nature, not susceptible to mathematical computation." *Mathie v. Fries*, 935 F. Supp. 1284, 1304 (E.D.N.Y.), *aff'd*, 121 F.3d 808 (2d Cir. 1997). Guidance may be found, however, in prior awards involving similar torts, similar injuries, or both. *See In re Air Crash Near Nantucket Island*, 307

22

F. Supp. 2d 465, 469 (E.D.N.Y. 2004) ("Damage awards in analogous cases provide an objective frame of reference, but they do not control [the Court's] assessment of individual circumstances." (quoting *Moore v. M/V Angela*, 353 F.3d 376, 384 (5th Cir. 2003))). Having undertaken an exhaustive review of such cases, the Court finds the following most apposite:

In *Sulkowska v. City of New York*, 129 F. Supp. 2d 274 (S.D.N.Y. 2001), the plaintiff was arrested, removed from her workplace in handcuffs, and detained for several hours in jail. She experienced no physical injury, but was humiliated by the events and suffered PTSD for two-and-a-half years. Finding that "the emotional injury that plaintiff has endured has been severely limiting, even debilitating at times, and will be a significant factor in plaintiff's life for the foreseeable future," the court awarded $275,000 for past and future pain and suffering. *See id.* at 309.

In *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003), an excessive force and battery suit, the Second Circuit reduced a $400,000 jury verdict for non-pecuniary damages to $250,000. The court noted that the plaintiff's physical injuries were not severe, but that the experience of being beaten and choked by a police officer while handcuffed was especially mentally traumatic. *See id.* at 186.

In *Bender v. City of New York*, 78 F.3d 787 (2d Cir. 1996), the Second Circuit reduced a $300,000 jury verdict to $150,000 in favor a plaintiff whose injuries consisted of a blow to the mouth, one day of confinement, criminal charges that were pending for six months, and "nightmares and occasional loss of sleep over a period lasting a year and a

23

half." *Id.* at 792; *see also Gardner v. Federated Dept. Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990) (affirming $150,000 jury verdict for physical and mental pain and suffering in false arrest and battery case); *Martinez v. Gayson*, 1998 WL 564385, at *6 (E.D.N.Y. June 30, 1998) (remitting award of compensatory damages from $310,000 to $160,000 in false arrest case where plaintiff suffered no physical injuries but was humiliated and held in custody for approximately five hours).

Finally, in a case not involving a false arrest or similar conduct, a New York State court reduced a jury award to $200,000 for the past and future pain and suffering of a plaintiff who suffered "principally from mild to moderate posttraumatic stress disorder" that did not "appear to be interfering with [her] life in any significant way." *Blakesley v. New York*, 734 N.Y.S.2d 800, 802 (4th Dep't 2001).

When adjusted for inflation, the awards in these cases fall, in the main, between $200,000 and $300,000. The nature of the harm here -- which involved an invasion of the sanctity of the home and, from Lillian's perspective, a risk of serious harm to her or her family -- was more traumatic than the stress of a simple false arrest. And, as the Court has found, that trauma had a particularly profound and long-lasting effect on Lillian's mental health and is chronic. For these reasons, the Court concludes that an award at the top of the range -- $300,000 -- is necessary to fully compensate Lillian for her past and future pain and suffering as a result of the incident.[8]

---

[8]It is, of course, more difficult to quantify pain and suffering where, as here, the plaintiff's emotional distress was caused a number of factors. Nevertheless, in assigning a value to the emotional distress suffered by Lillian as a result of Corley's

## CONCLUSION

For the foregoing reasons, the Court concludes that it has subject-matter jurisdiction; accordingly, the United States's motion to dismiss is denied. On the merits, the Clerk is directed to enter judgment in favor of Lillian Carter and against the United States, in the amount of $300,000. The award shall bear post-judgment interest, but not pre-judgment interest. *See* 28 U.S.C. § 2674 ("The United States . . . shall not be liable for interest prior to judgment or for punitive damages.").

**SO ORDERED.**

s/Frederic Block
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 20, 2010

---

negligence, the Court has made every effort to take the other stressors in Lillian's life into account. *See Mathie*, 121 F.3d at 815 (approving damages award accompanied by a "candid recognition by an experienced and thoughtful judge that the duality of the causation was taken into account").